IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| RICHARD WALKER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED | : | |
| *PLAINTIFF*, | : | CIVIL ACTION |
| V. | : | <u>JURY TRIAL DEMANDED</u> |
| | : | CASE NO. 1:16-CV-2595 |
| THE MID-AMERICA INTERCOLLEGIATE ATHLETICS ASSOCIATION, AND THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION | : | |
| *DEFENDANTS*. | : | |

## CLASS ACTION COMPLAINT

Plaintiff Richard Walker brings this Class Action Complaint and Demand for Jury Trial against the above-captioned Defendants, including the Mid-America Intercollegiate Athletics Association (formerly known as the "Missouri Intercollegiate Athletic Association") ("the Conference")[1] and the National Collegiate Athletic Association ("NCAA," collectively "Defendants"), to obtain redress for all persons injured by their reckless disregard for the health and safety of generations of Missouri State University ("MSU")[2] student-athletes. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

---

[1] At the time that Plaintiff played college football as a student-athlete at MSU, the Conference was operating under the name "the Missouri Intercollegiate Athletic Association," but its name was changed in 1992 following an expansion beyond the borders of Missouri.

[2] Missouri State University was organized in 1905 as a public educational institution in Springfield, Missouri (although it has borne many other names over the years, mostly recently "Southwest Missouri State University").

## INTRODUCTION

1. Nearly one hundred thousand student-athletes participate in NCAA football each year as part of "America's sport," which draws millions of Americans as enthusiastic patrons every week during the season. On game days, hundreds of thousands of fans fill college football stadiums around the country, while millions more view the games on television or over the Internet. These young, impressionable, and eager-to-please players are motivated by their school, their conference, and the governing athletic organization to strive for excellence by doing "whatever it takes."

2. For decades, the NCAA football program has served as a training ground for the National Football League ("NFL"), operating as a sports enterprise that closely resembles a professional sports league—particularly in terms of the NCAA's lucrative broadcast contracts and other sundry sources of revenue, which have all accrued to the direct benefit of the NCAA, the Conference, and MSU.

3. Despite decades of foreknowledge, Defendants have concealed from both student-athletes and the general public the endemic deleterious effects caused by football's medical touchstones: head trauma, concussions, and neurological injuries.

4. During the course of the NCAA football season, student-athletes may be exposed to more than 1,000 impacts exceeding 10 units of gravitational force ("g's"), with the majority of football-related impacts to student-athlete's heads exceeding 20 g's, and some impacts registering near 100 g's. To put these numbers in the proper context, an unsecured front-seat passenger in a vehicle travelling 25 m.ph. that strikes a wall would experience an impact force of approximately 100 g's. Therefore, cumulatively,

thousands of NCAA student-athletes are being subjected to head trauma that is the equivalent of several hundred car accidents every football season.

5. This repetitive and violent head trauma has caused student-athletes to suffer repeated concussions, and significantly increased their risk for long-term neurological injuries, including: memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Alzheimer's disease, Parkinson's disease, other neurocognitive disorders/injuries, and their related symptoms.

6. Unfortunately, Defendants have known—for decades—about the debilitative long-term dangers associated with concussions, concussion-related injuries, and sub-concussive injuries (referred to, collectively, as "traumatic brain injuries" or "TBIs") that result from playing college football. Defendants actively concealed this information to protect the lucrative business of so-called "amateur" college football.

7. Despite undertaking obligations to provide a safe athletic environment, and to safeguard the well-being of student-athletes, Defendants did not implement adequate procedures and protocols to guard against the risks of TBIs, and the resulting neurocognitive disorders and injuries that will affect these student-athletes for the rest of their lives.

8. As a direct result of Defendants' actions, omissions, and deliberate concealment, Plaintiff and a class of former student-athletes (defined below) now suffer from various neurological and cognitive medical ailments, including, but not limited to, the symptoms of CTE and similar neurocognitive disorders.

**THE PARTIES**

9. Plaintiff, Richard Walker, is an adult male who resides in St. Louis, Missouri.

10. Defendant Mid-American Intercollegiate Athletics Association is a collegiate athletic conference with its principal office located 1627 Main Street, Suite 901, Kansas City, Missouri, and with member institutions in three (3) states. The Conference conducts business throughout the States of Missouri, Kansas, and Oklahoma, and the United States.

11. Defendant National Collegiate Athletics Association is an unincorporated association with its principal office located at 700 West Washington Street, Indianapolis, Indiana. The NCAA conducts business throughout this District, the State of Indiana, and the United States.

**JURISDICTION AND VENUE**

12. This Honorable Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) because: (1) at least one member of the Class—which consists of at least 100 members—is a citizen of a state different from Defendants; (2) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (3) none of the exceptions enumerated under that subsection apply to this action.

13. This Honorable Court has personal jurisdiction over Defendants because they conduct significant business in this District, including establishing consumer and business contracts, and because the unlawful conduct alleged in this Class Action Complaint occurred in, was directed at, and emanated in part from this District.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Plaintiff's claims occurred in and/or emanated from this District and because the NCAA resides in this District.

## FACTUAL BACKGROUND – GENERAL

### I. Defendants Had a Duty to Protect Student-Athletes

15. The NCAA is the governing body of collegiate athletics, overseeing 23 college sports and over 400,000 student-athletes participating in intercollegiate athletics, including in the MVFC and the football program at MSU. According to the NCAA, "[m]ore than 1,200 schools, conferences, and affiliate organizations collectively invest in improving the experiences of student-athletes—on the field, in the classroom, and in life."[3]

16. To accommodate the wide spectrum of student-athletes at its member schools, the NCAA has three different "divisions" of intercollegiate athletic competition. Division I is the highest level of intercollegiate athletes sanctioned by the NCAA and includes many well-known universities, with high-ranking teams, larger operating budgets, better athletic facilities, and greater scholarship endowments.

17. Each NCAA Division is composed of several "conferences" to facilitate regional league play. The Conference was chartered in 1912 to direct and organize interscholastic athletic competitions, conduct tournaments, and prescribe rules for student-athletes. MSU was an original charter member of the Conference, and remained as a member until 1981, when it "departed for Division I" and joined the Mid-Continent Conference. Currently, the Conference has 14 member institutions located

---

3 *Membership*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), *available at* http://www.ncaa.org/about/who-we-are/membership.

throughout Kansas, Missouri, and Oklahoma. *See*, *e.g.*, *Conference History*, Mid-American Intercollegiate Athletics Association, *available at* http://www.themiaa.com/sports/2012/5/21/history.aspx (last visited Sept. 29, 2016).

18. Collectively, Defendants govern and regulate the MSU football program and owe a duty of care to the student-athletes under their supervision and authority.

19. When it was originally founded as the Intercollegiate Association of the United States ("IAAUS"), the NCAA was lauded as "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and through life." *About the NCAA*, NATIONAL COLLEGIATE ATHLETIC ASSOCIATION (May 17, 2016), *available at* http://www.ncaa.org/about (last visited Sept. 29, 2016).

20. In fact, the IAAUS—which was renamed in 1910—was created at the behest of U.S. President Theodore Roosevelt, who convened a group of university professors and athletic coaches to discuss the alarming rates of head injuries resulting from college football. Even at its inception, the NCAA's stated objective was the promotion of student-athlete safety and well-being.

21. Moreover, as the NCAA makes clear in its communications regarding membership, the overseeing of collegiate athletics is a cooperative and all-inclusive tasks that is spread amongst many different pedagogical agents: "College and university presidents and chancellors guide each division, supported by an extensive committee structure guided by athletic administrators, faculty[,] and student-athlete representatives . . . [thereby, each] division creates its own rules that follow the overarching principles of the NCAA." *Membership*, National Collegiate Athletic

Association (May 17, 2016), *available at* http://www.ncaa.org/about/who-we-are/membership (last visited Sept. 29, 2016).

22. The governing principles of the NCAA—not least of all its commitment to safeguarding the health and well-being of student-athletes—are enshrined in the NCAA Constitution. This document establishes NCAA's fundamental policies, which include commitments: (1) to initiate, stimulate, and improve intercollegiate athletics programs for student-athletes; and (2) to uphold the principal of **institutional control** of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of the NCAA. *See*, *e.g.*, NCAA Constitution, Art. I, §§ 1.2(a)-(b) (emphasis added).

23. The NCAA Constitution also states that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the enforcement procedures of the [NCAA] shall be applied to an institution when it fails to fulfill its obligation." *Id.* at § 1.3.2.

24. Article 2.2 of the NCAA Constitution is instructive to the instant controversy—titled "The Principle of Student-Athlete Well-Being," it provides as follows: "Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student[-]athletes."

25. Furthermore, Article 2.2.3 of the NCAA Constitution ("Health and Safety") unequivocally states that "[i]t is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student[-]athletes."

26. To these ends, the NCAA devises and maintains standard athletic regulations and requirements that govern and bind its member institutionsl, including, but not limited, the NCAA Constitution, the NCAA Operating Bylaws, and the NCAA Administrative Bylaws. These documents provide guidance on game rules, student-athlete eligibility, scholarship parameters, and institutional obligations attendant regarding the well-being and safety of student-athletes:

> Each institution shall comply with all applicable rules and regulations of the [NCAA] in the conduct of its intercollegiate athletics programs . . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletic interests shall comply with the applicable [NCAA] rules, and the member institution shall be responsible for such compliance.

NCAA Const., Art. 2, § 2.8.1.

27. In addition to the documents described above, the NCAA also publishes annual guidelines regarding student-athlete health and safety titled the Sports Medicine Handbook ("the Handbook"). *See*, *e.g.*, David Klosser, 2013-14 NCAA Sports Medicine Handbook, National Collegiate Athletics Association (Aug. 2013). The Handbook includes the NCAA's official policies for the prevention and treatment of sports-related injuries, as well as parameters regarding when injured student-athletes may resume participation in athletics. Overall, the Handbook recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of injury from athletics participation."

28. In addition to setting forth minimum requirements, the NCAA Constitution also promises to directly aid member institutions in their ongoing compliance efforts: "[The NCAA] shall assist the institution in its efforts to achieve full compliance with all rules and regulations." *See*, *e.g.*, NCAA Const., Art. 2, § 2.8.2.

29. In addition to binding individual academic institutions, the NCAA Constitution also contemplates and addresses the rights and responsibilities of intercollegiate athletics conferences, which are entitled to all of the privileges of active member institutions (save the right to compete in NCAA championships). *See*, *e.g.*, NCAA Const., Art. 3, § 3.02.3.2. Furthermore, "conferences of the [NCAA] agree to administer their athletics programs in accordance with the constitution, bylaws[,] and other legislation of the [NCAA]." NCAA Const., Art. 3, § 3.3.4.

30. Therefore, the NCAA holds itself out as a proponent of, authority regarding, and regulatory institution overseeing the prevention and treatment of sports-related injuries affecting student-athletes. In particular, the NCAA's governing documents indicate that member institutions—like MSU and the Conference—rely upon the NCAA for guidance and support on issues of student-athlete safety and well-being.

31. Consequently, as a member conference, the Conference is charged with implementing and enforcing NCAA guidelines to meaningfully protect the health and safety of MSU football players, including Plaintiff and the members of the Class. *See*, *e.g.*, NCAA Const., Art. 3, §§ 3.02.3.2, 3.3.4.

32. When compared to Plaintiff and the members of the Class, Defendants were both in superior positions to know about, recognize, and mitigate the risks of TBIs.

## II. Decades of Medical Research has Unequivocally Established the Dangers Associated with Football-Related TBIs

33. Throughout the Twentieth Century, and continuing into the Twenty-First Century, numerous studies have firmly established that repetitive trauma to the head can result in concussions, and are associated with heightened risks of long-term TBIs, including memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's

disease, other neurocognitive disorders/injuries, and their related symptoms. To better understand the nature of this body of research, a brief review and introduction to the material is produced below:

A. *<u>An Overview of Football-Related TBIs</u>*

34. A "concussion" is defined as a TBI caused by an impact that causes a person's head and brain to move rapidly back and forth. This movement causes the brain to bounce and twist inside of the skull, which can damage brain cells and catalyze chemical changes in the brain.

35. Typically, the brain is cushioned by the presence of spinal fluid between the soft brain tissue and the hard exterior of the skull. But, even relatively minor impacts—including indirect impacts that do not directly strike the head, such as those that produce a "whiplash" effect in the neck—can produce sufficient brain movement to breach the permeable barrier of the spinal fluid and "knock" against the skull. It is this type of intracranial impact that causes concussions.

36. Specifically, concussions typically occur when linear and rotational accelerations impact the brain through direct impacts to the head, or indirect impacts that "whiplash" the head. As aforementioned, student-athletes playing a full season of football can expect to receive more than 1,000 impacts exceeding 10 g's (slightly more gravitational force than that experienced by fighter pilots executing maximal maneuvers). However, the majority of football-related impacts exceed 20 g's.

37. Dr. Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour

and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100 [g's]: in effect, [a player who sustained two hits about 80 g's], had two car accidents that morning."[4]

i. *Concussion Symptoms*.

38. Following a severe impact, student-athletes may begin exhibiting TBI symptoms, including, but not limited to:

- Feeling dazed, dizzy, or lightheaded (*i.e.*, "seeing stars");
- Memory loss, including short-term memory loss and retrograde amnesia;
- Nausea and/or vomiting;
- Headaches;
- Blurred vision and light sensitivity;
- Slurred speech, or difficulty communicating lucidly;
- Difficulty concentrating, thinking, or making decisions;
- Diminished coordination and balance (including hand-eye coordination, such as being unable to catch a thrown ball);
- Anxiety and irritability; and/or
- Exhaustion.

39. Student-athletes may not be able to immediately recognize the symptoms of TBIs (or, worse yet, the symptoms themselves may interfere with their ability to evaluate and recognize these life-threatening problems), which creates the likelihood of further, more-serious injury. Specifically, student-athletes who return to an athletic

[4] Malcolm Gladwell, *Offensive Play*, THE NEW YORKER (Oct. 19, 2009), *available at* http:// http://www.newyorker.com/magazine/2009/10/19/offensive-play.

schedule before they have adequately healed from previous TBIs place themselves at ever-increasing risks of compounding their concussion-related injuries.

ii. *Medical Treatment of TBIs*

40. After suffering a TBI (such as a concussion), a student-athlete's brain requires time to heal. Doctors generally prohibit such individuals from returning to "normal" activities—up to, and certainly including, full contact sports—until all TBI-related symptoms have ceased. This is particularly so because an already injured brain is particularly vulnerable to further injury and trauma.

41. The time required for such healing varies from person-to-person, and injury-to-injury, with TBI-related symptoms sometimes persisting for weeks at a time.

42. Individuals who fail to recover from TBIs within a few weeks are diagnosed as suffering from "post-concussion syndrome." Those diagnosed with post-concussion syndrome are typically referred to medical specialists to address their symptoms, which can last for months, years, or become permanent.

43. As such, concussions constitute a potentially cumulative, long-term, and debilitating medical problem in many circumstances.

B. *The Long-Term Dangers of TBIs are Well-Documented*

44. The two leading studies examining the long-term effects of TBIs were conducted at Boston University's Center for the Study of Traumatic Encephalopathy, and the Brain Injury Research Institute (located near Pittsburgh, PA). These studies enumerate the "devastating consequences" of repeated TBIs, including increased risks of depression, dementia, suicide, and a host of other medical problems. The studies have

also demonstrated that repeated TBIs trigger the progressive degeneration of brain tissue, including the build-up of an abnormal protein ("tau").

45. Between 2002 and 2007, Dr. Bennett Omalu of the Brain Injury Research Institute examined the brains of five former NFL athletes: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Four of these players died under tragic and strange circumstances: Waters and Nash committed suicide, Webster died of heart failure while homeless and cognitively impaired, and Strzelcyyk died in a car accident that resulted from him driving the wrong way down a highway at 90 m.p.h. Four of the five players' brains were found to have telltale signs of CTE, which is a progressive degenerative disease of the brain affecting people with histories of repetitive TBIs.

46. Dr. Robert Cantu, of the Boston University Center for the Study of Traumatic Encephalopathy, has found evidence of CTE in 96 percent of the autopsies performed on the brains of former NFL players (90 out of 94 subjects). Furthermore, Dr. Cantu has found evidence of CTE in 79 percent of the autopsies performed on the brains of all former football players (<u>regardless of the level of the sport that they may have played while alive</u>).

47. Dr. Omalu asserts that more than 90 percent of NFL players suffer from CTE.

48. Unfortunately, medical studies similar to the ones produced by Drs. Omalu and Cantu date back to the early Twentieth Century. Beginning with studies examining boxing-related TBIs during the 1920's, medical science has long-recognized the debilitating effects of TBIs. That repetitive head trauma and TBIs cause permanent

brain damage and produce increased risks of long-term neurocognitive disorders has been well-established for nearly a century.

49. For example, Dr. Harrison Martland produced and published a study titled "Punch Drunk" in the Journal of the American Medical Association in 1928 describing the spectrum of clinical abnormalities observed in some 50 percent of boxers who had suffered a considerable impact to the head (or been knocked out). *See*, *e.g.*, Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

50. Numerous later studies confirmed Martland's initial findings, which established that boxers who had suffered TBIs displayed signs of dementia, motor function impairment, and a "Parkinsonian" pattern of progressive neurological decline. *See*, *e.g.*, Drs. Ewald W. Busse & Albert J. Silverman, *Electroencephalographic Changes in Professional Boxers*, 149 J. AM. MED. ASS'N 1522, 1522 (1952) ("[T]he mild psychic changes observed in a high percentage of boxers . . . are due to brain damage, which is also responsible for the less frequently seen, so-called 'punch-drunk' person, who is in fact in a state of traumatic dementia and reveals severe psychic and neurological abnormalities.").

51. Following Dr. Martland's study, the American Football Coaches Association published a report warning and advising that athletes suffering from concussions should be removed from play.

52. In 1952, an article in the *New England Journal of Medicine* recommended a "three-strike rule" for concussions in football, whereby athletes would be required to cease playing football, permanently, after receiving three concussions. *See*, *e.g.*, Dr.

Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 NEW ENG. J. MED. 554, 555-56 (1952).

53. In 1967, Drs. John R. Hughes and D. Eugene Hendrix published a study indicating that severe impacts affected brain activity in football by monitoring the effects with electroencephalograms ("EEGs"). *See*, *e.g.*, *Telemetered EEG from a Football Player in Action*, ELECTROENCEPHALOGRAPHY & CLINICAL NEUROPHYSIOLOGY 24:183-86 (1967).

54. These studies, along with many, many other pieces of accepted scholarly medical research, have warned of the dangers of single concussions, multiple concussions, and/or other football-related TBIs, and collectively establish that:

- Repetitive head trauma in contact sports, including football, carries the potential for devastating, long-term negative effects on neurological function;
- Encephalopathy ("*dementia pugilistica*") is caused by repeated sub-concussive and concussive blows to the head;
- Acceleration and rapid deceleration of the head that results in a brief loss of consciousness results in tearing of the axons (*i.e.*, cells) of the brain stem;
- There is a direct relationship between an athlete's neurological pathology and the length of his career in contact sports;
- Concussions cause immediate retrograde memory issues;
- TBIs require recovery time without the risk of re-injury or complications;
- Football players suffering from concussions require significant rest before being subjected to further potential trauma; and,

- Even minor head trauma can lead to neuropathological and neurophysiological alterations, including: (1) neuronal damage, (2) reduced cerebral blood flow, (3) altered brainstem evoked potentials, and (4) reduced information-processing speeds.

55. These same studies offer numerous recommended changes to accommodate TBIs and concussion-related illnesses, safely, within the game of football.

56. In 1991, Dr. Cantu, the American Academy of Neurology, and the Colorado Medical Society developed and issued "return-to-play" criteria for athletes suspected of having suffered TBIs while playing football.

57. Building upon the guidelines established therein, a conference of neurological experts gathered in Prague in 2004 and provided recommendations for athletes suffering TBIs and concussive injuries in football, ice hockey, rugby, and other sports based on the research and best practices available at the time. Overall, the experts recommended a policy of refusing to allow symptomatic players to return to the field, coining the phrase: "When in doubt, sit them out." *See*, *e.g*., Paul McCrory, *et al*., *Summary and agreement statement of the 2nd International Conference on Concussion in Sport, Prague 2004*, BRITISH J. SPORTS MED., 39:196-204 (2005), *available at* http://bjsm.bmj.com/content/39/4/196.full.

58. While the NCAA and the Conference knew for decades of the harmful effects of TBIs upon student-athletes, they ignored these facts and failed to institute meaningful responses and policies to warn and/or protect the student-athletes, including Plaintiff and the Class. For Defendants, the continued expansion and lucrative operations of "amateur" college football were simply too profitable to risk.

## III. Defendants Breached Their Duties to Student-Athletes by Concealing the Dangers of TBIs and Refusing to Implement Reasonable Management Protocols.

59. Despite having full knowledge regarding the devastating, long-term effects and risks associated with TBIs sustained by playing college football, Defendants actively concealed these risks (including memory loss, dementia, depression, and CTE) from its student-athletes and the general public.

60. Upon information and belief, during every decade referenced above, Defendants were advised by physicians, researchers, and scientists concerning the severe risks associated with playing college football, including the risks associated with TBIs.

61. Rather than fully apprising their student-athletes of the danger, or implementing protocols to safeguard and protect their student-athletes from TBIs (as promised through the binding terms of the NCAA Constitution), Defendants failed to adopt the internationally accepted guidelines and "return-to-play" parameters described above until 2010.

62. In flagrant disregard for the vast body of known and vetted scientific research, and in derogation of the authority vested in them by the precepts governing collegiate sports, Defendants designed and orchestrated policies regarding football practices and games that:

- Ignored the medical risks to Plaintiff and the members of the Class;
- Aggravated the medical risks to Plaintiff and the members of the Class;

- Failed to apprise Plaintiff and the members of the Class concerning the demonstrated links between TBIs sustained playing football and the aforementioned neurological illnesses and conditions;
- Failed to implement or enforce a reasonable system to prevent or mitigate the harms suffered by Plaintiff and the members of the Class; and,
- Failed timely to implement "return-to-play" protocols and other internationally accepted norms related to TBIs suffered while playing sports.

63. Indeed, the NCAA failed to acknowledge the dangers of TBIs in its "Sports Medicine Handbook" until 1994, when a section captioned "Guideline 20: "Concussions and Second Impact Syndrome" ("Guideline 20") was added. However, rather than mandating best practices for its member institutions, Guideline 20 left the management of TBIs to the discretion of individual institutions.

64. For example, while the 1998–99 version of Guideline 20 reported that "[c]oncussion and the resulting potential complications, such as second-impact syndrome, are potentially life-threatening situations that student-athletes may suffer as a result of their athletics participation," it also provided that the NCAA "does not endorse any specific concussion grading scale or return-to-play criteria."

65. In this way, Guideline 20 was an attempt by the NCAA to disclaim liability, while shirking its obligation to safeguard the well-being of student-athletes.

66. Despite having <u>actual knowledge</u> of the dangers of TBIs, the NCAA refused to implement, endorse, or even recommend specific best practices, such as a concussion grading scale or return-to-play criteria.

67. The inadequacy Guideline 20 was aggravated and exacerbated by Defendants' complete failure to adopt or implement any meaningful TBI safety measures, or develop any return-to-play guidelines for decades.[5]

68. Moreover, the Defendants failed to comply with, or enforce, Guideline 20's statement provision that "[a] student athlete rendered unconscious for any period of time should not be permitted to return to the practice or game in which the head injury occurred. In addition, no student-athlete should be allowed to return to athletics activity while symptomatic."

69. Ultimately, until 2010, Defendants collectively and/or individually:

- Failed to implement guidelines to prevent repeated TBIs;
- Failed to educate student-athletes about the increased risk of TBIs in football;
- Compelled and coerced Plaintiff and the other members of the Class to ignore TBI-related symptoms and continue to play football within moments of experiencing TBI symptoms;
- Failed to contact Plaintiff and the other members of the Class after they left school to inform them that had been exposed to an increased risk of long-term brain damage by the TBIs sustained while playing football;
- Failed to recommend or enforce "return-to-play" protocols; and/or

[5] In fact, MSU's football program had no formal concussion-related safety measures or protocols in its Student-Athlete Handbook as late as 2008. *See, e.g., Student-Athlete Handbook*, Missouri State University, (Sept. 29, 2016 @ 7:08 p.m.), *available* at https://www.missouristate.edu/assets/policy/Op6.07_Student-Athlete_Handbook.pdf.

- Failed to conduct a football program that proactively rewarded Plaintiff and the other members of the Class for receiving and inflicting TBIs.

70. Moreover, MSU student-athletes, including Plaintiff and the other members of the class, sustained TBIs and inflicted TBIs on other players for the purposes of advancing the MSU and Defendants' football program by winning games, thereby accruing fame and favorable publicity to Defendants, and generating millions of dollars in revenue for MSU, the Conference, and the NCAA.

71. It was not until April 2010, under mounting public pressure and negative publicity, that the NCAA finally made definitive changes to its concussion treatment protocols by adopting legislation requiring all of its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

72. Under this new NCAA concussion policy, member institutions were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

73. The NCAA concussion policy further provided that student-athletes diagnosed with a TBI "shall not return to activity for the remainder of that day" and that the team physician would be required to gauge medical clearance.

74. Finally, the NCAA concussion policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that student-athletes would be provided with educational materials.

75. However, this policy, too, is flawed: due to the very nature of concussions, student-athletes suffering from TBIs, and the related symptoms, are in no position to medically assess themselves, or to provide informed consent to continue participating in athletics.

76. As Defendants are aware, the types of questions used to screen student-athletes for concussions include: "what is your name?"; "what year is it?"; and "what sport are we playing?" These are the types of questions that student-athletes experiencing TBIs routinely fail to answer correctly. A student-athlete who cannot state their own name is in no condition to make an informed decision about whether or not to continue participating in athletics, and is entirely dependent on others—such as Defendants—to identify TBIs in real-time and take appropriate remedial action. For an injured student-athlete, Defendants stand in the role of a guardian tasked with making decisions in the student-athlete's best interest. For decades, Defendants have failed to honor their legal obligations by fulfilling that role and have, instead, acted solely in their own respective pecuniary interests, all to the life-long detriment of thousands of student-athletes.

77. These still-deficient policies were implemented far too late. Plaintiff and the Class have suffered reasonably foreseeable harm as a result of Defendants' actions.

## IV. <u>Facts Specific to Plaintiff</u>

78. Plaintiff Richard Walker was a student-athlete at MSU, and played four seasons of football at various positions, from 1976–1979.

79. Walker suffered at least four (4) TBIs at MSU during hitting drills, regular practices, and games. During all four of these incidents, Walker completely lost consciousness, and was ultimately diagnosed with concussions.

80. In addition to suffering at least four TBIs, Walker also experienced approximately 12 episodes of "blacking out" at games and practices, during which he also would "lose his bearings and balance" to the extent that he would have to rest before he was eventually returned to play. Despite awareness of these episodes, and Walker's condition, no ameliorative actions were taken on Walker's behalf.

81. Over time, Walker has begun to experience the devastating consequences of these TBIs. He has struggled with the symptoms attendant to the neurological disorders caused by his time playing football at MSU, including severe depression, increased irritability, loss of memory, anxiety, inability to focus, and loss of cognitive function.

82. During the time Walker was a student-athlete at MSU, Defendants failed to implement any concussion management protocols or policies. Likewise, during that time, Defendants failed to implement any meaningful "return-to-play" guidelines.

83. While Walker was being subjected to severe, repetitive TBIs for the profit and promotion of Defendants, they never informed or educated Walker regarding the short-term and long-term health risks associated with TBIs

84. Furthermore, Defendants never instituted appropriate health-and-safety protocols to monitor, manage, and mitigate risks associated with TBIs—throughout the years Plaintiff and the other members of the class were student-athletes at MSU.

85. During the time in which Plaintiff and the other members of the Class were MSU student-athletes, Defendants ignored the medical evidence and recommendations of experts regarding TBIs, and failed to protect the health and well-being of its student-athletes who participated in its football program, including Plaintiff.

## CLASS ACTION ALLEGATIONS

86. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of himself and a Class defined as follows: "All individuals who participated in the Conference's football program between 1976 and 2010."

87. The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

88. **Numerosity**: The exact number of the members of the Class is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, hundreds of MSU football players fall into the definition of the Class. Members of the Class can be identified through Defendants' records.

89. **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to the following:

a. Whether Defendants had a duty to adequately warn and educate MSU student-athletes, including Plaintiff and the Class, about the dangers and symptoms of TBIs;

b. Whether Defendants had a duty to enact rules and procedures to protect student-athletes, including Plaintiff and the Class, from sustaining concussions and concussion-related traumatic brain injuries;

c. Whether Defendants' conduct as alleged herein constitutes and breach of duty;

d. Whether Defendants' conduct as alleged herein constitutes negligence;

e. Whether Defendants' conduct as alleged herein constitutes breach of contract;

f. Whether Defendants' conduct as alleged herein constitutes fraudulent concealment;

g. Whether Defendants' were unjustly enriched at the expense of Plaintiff and the Class; and

h. Whether Plaintiff and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

90. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class, as Plaintiff and other members of the Class sustained damages arising out of the wrongful conduct of Defendants based upon the same negligent conduct.

91. **Adequate Representation**: Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interest antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

92. **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. The damages suffered by the individual members of the Class are relatively small in comparison to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for the members of the Class to obtain effective relief from Defendants' misconduct on an individual basis. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**COUNT I:**
**NEGLIGENCE**
(*Individually and on Behalf of the Class as Against All Defendants*)

93. Plaintiff incorporates by reference all of the foregoing allegations and statements.

94. From its inception and by virtue of its role as the governing body in college athletics, Defendant NCAA has historically assumed a duty to protect the health and safety of all student-athletes at its member institutions. The NCAA has also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of the student-athletes under its purview, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and to provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes participating in football.

95. Defendant Mid-America Intercollegiate Athletics Association assumed similar duties to its student-athletes, including Plaintiff and the other members of the Class.

96. Defendants' duties included an obligation to supervise, regulate, and monitor the rules of the Conference football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to MSU student-athletes.

97. Defendant NCAA had an additional duty to educate MSU, the Conference, and MSU student-athletes regarding the proper ways to evaluate and treat TBIs during football games and practices. The NCAA's duty further subsumed a duty to warn

student-athletes of the immediate dangers of TBIs and the attendant long-term risks of neurocognitive dysfunction.

98. Defendants had a duty not to conceal material information from MSU football players, including Plaintiff and the other members of the Class.

99. Defendants breached their duties to Plaintiff and the Class by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing/practice fields, in locker rooms, and in the days, weeks, and months after MSU football players sustained TBIs, as well as providing treatment for the latent effects of TBIs. These failings include, but are not limited to:

a. Failing to recognize and monitor TBIs during football practices and games;

b. Failing to inform student-athletes of the dangers of concussive injuries;

c. Failing to implement appropriate "return-to-play" procedures and regulations for student-athletes who sustained TBIS and/or were suspected of sustaining such injuries;

d. Failing to implement procedures to monitor the health of student-athletes who have sustained (or are suspected of sustaining) TBIs;

e. Failing to inform the extended families of student-athletes regarding TBIs sustained by their family member; and

f. Failing to provide adequate notification, warning, and treatment for the direct and latent neurocognitive and neurobehavioral effects of TBIs, after the time Plaintiff left MSU.

100. Defendants breached their duties to Plaintiff and the other members of the Class by fraudulently concealing, failing to disclose, failing to recognize, and/or being willfully blind to: (1) material information regarding the long-term risks and effects of repetitive TBIs that Defendants possessed or should have possessed; (2) the dangers of TBIs; and (3) the proper methodologies for Defendants, Defendants' employees and agents, student-athletes, and other related third parties to evaluate, treat, and avoid TBIs.

101. Plaintiff and the other members of the Class relied upon the guidance, expertise, and instruction of Defendants in understanding the risks associated with the serious and life-altering medical issues attendant to TBIs suffered while playing football.

102. At all times, Defendants had superior knowledge of material information regarding the effect of repeated TBIs. Because such information was not readily available to Plaintiff and the other members of the Class, Defendants knew or should have known that Plaintiff would act and rely upon the guidance, expertise, and instruction of Defendants on these crucial medical issues, while student-athletes at MSU and thereafter.

103. Repetitive TBIs during college football practices and games have a pathological and sinisterly latent effect on the brain. Repetitive TBIs cause deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as the "tau" protein, which is a signature pathology of the same phenomenon as *dementia pugilistica* (or "punch drunk syndrome") studied and reported by the medical authorities cited above.

104. Plaintiff and the other members of the Class experienced repetitive TBIs during his college football career that significantly increased his risk of developing neurodegenerative disorders and diseases, including but not limited to: memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Alzheimer's disease, Parkinson's disease, other neurocognitive disorders/injuries, and their related symptoms.

105. The repetitive head acceleration-deceleration, or "whiplash" hits, to which Plaintiff was exposed on a regular basis presented risks of latent and long-term debilitating chronic illnesses. Absent Defendants' negligence and concealment, the risks of harm to Plaintiff would have been materially lower, and Plaintiff would not have sustained the brain damage from which he currently suffers.

106. The repetitive impacts and TBIs Plaintiff sustained while playing football at MSU resulted in neurocognitive and neurobehavioral changes in Plaintiff, including neuro-cognitive disability, decline, and forgetfulness, all of which will have affected the quality of his life and will require ongoing future medical care.

107. As a direct and proximate result of Defendants' negligence, Plaintiff has incurred damages in the form of permanent brain damage, emotional distress, past and future medical costs, health care, home care expenses, other out-of-pocket expenses, lost time, lost future earnings, and other damages. Plaintiff will likely incur future damages caused by Defendants' negligence.

108. As a result of their misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on

behalf of the Class, seeks actual damages for Defendants' negligence, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**<u>COUNT II</u>:**
**FRAUDULENT CONCEALMENT**
(*Individually and on Behalf of the Class as Against All Defendants*)

109. Plaintiff incorporates by reference all of the foregoing allegations.

110. Defendants knew that repetitive head impacts in football games and full-contact practices created a substantial and real risk of harm to student-athletes. This risk of harm is similar or identical to the risks borne by boxers who suffer repetitive impacts to the head during practices and matches, as well at the risk to professional football players, many of whom have been forced to retire due to TBIs and the resulting neurological injuries and disease.

111. Defendants were aware of and understood the significance of the published medical literature described in the preceding paragraphs of this Class Action Complaint, which detailed the serious risk of short-term and long-term brain injury associated with the repetitive traumatic impacts to the head to which MSU football players were regularly exposed.

112. Defendants were willfully blind to and/or knowingly concealed from Plaintiff and the other members of the Class the risks of TBIs to student-athletes participating in NCAA football games and practices, including the risks associated with returning to physical activity too soon after sustaining a TBI.

113. By concealing material facts, Defendants intended to induce a false belief under circumstances creating a duty to speak. Defendants intended to induce a false belief that Plaintiff and the other members of the Class that it was safe to continue to

participate in the football program (and that Plaintiff and the other members of the Class should not be prevented from continuing to participate in the football program) after a TBI, or even multiple TBIs, despite the fact such injuries require time and rest to properly heal.

114. Plaintiff and the other members of the Class could not have reasonably been expected to know or discover the truth about the risks associated with TBIs, or were prevented or mislead from obtaining such truthful information. Plaintiff and the other members of the Class were under the care and treatment of Defendants and justifiably relied on their silence when Defendants had an obligation to disclose the facts concerning the risk of TBIs sustained while participating in football.

115. Given Defendants' superior and unique vantage point, Plaintiff and the other members of the Class reasonably looked to and relied upon Defendants for guidance on TBIs, including the later-in-life consequences of the repetitive injuries Plaintiff and others sustained while a football player at MSU.

116. This concealed information was such that Plaintiff and Class members would have acted differently if they had been aware of the material facts known to, and concealed by, Defendants. Had Plaintiff and members of the Class known the full facts in Defendants' possession, they: (1) would not have continued to play football after sustaining a TBI; or (2) would have taken additional time off from participating to allow their injuries to fully heal before returning to play; or (3) would have taken additional precautions while playing football; or (4) would not have continued to play college football at all. Despite Defendants' knowledge, they failed to act reasonably by developing appropriate guidelines regarding "return-to-play" criteria and other

meaningful safety procedures. Defendants' inaction and concealment greatly increased the risks of long-term injury and illness to their student-athletes, including Plaintiff and the other members of the Class.

117. As a direct and proximate result of Defendants' knowing concealment and/or willful blindness, Plaintiff and the other members of the Class have suffered, and will continue to suffer, substantial injuries, emotional distress, pain and suffering, and economic and non-economic damages that are ongoing in nature.

118. As a result of their misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' fraudulent concealment, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT III:**
**BREACH OF EXPRESS CONTRACT**
(*Individually and on Behalf of the Class as Against All Defendants*)

119. Plaintiff incorporates by reference all of the foregoing allegations.

120. As a football player at MSU, an institution governed by the NCAA and the Conference, Plaintiff and the other members of the Class were required to, and did, enter into a contract with the NCAA as a prerequisite to sports participation. The contract required Plaintiff to complete a form affirming that he had read the NCAA regulations and applicable NCAA Division manual, which expressly encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and further, that he agreed to abide by NCAA Division bylaws.

121. In exchange for Plaintiff's and the Class members' agreement, the NCAA promised to perform certain services and functions, including, inter alia:

a. Conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational welfare of student-athletes;

b. Requiring that each member institution protect the health of, and provide a safe environment for, each of its participating student-athletes; and

c. Requiring that each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.

122. By signing and agreeing to abide by NCAA regulations, and thereafter participating in a NCAA-sanctioned sports program in accordance with such regulations, Plaintiff and the other members of the Class fulfilled their contractual obligations to the NCAA.

123. As described in the foregoing allegations, Defendants breached the Parties' agreement by failing to ensure that their student-athletes were provided with a safe environment in which to participate in their NCAA sport activities. Defendants further breached the contract by concealing and/or failing to properly educate and warn players about the symptoms and long-term risks of TBIs.

124. Plaintiff entered into a written agreement with the NCAA in which he committed to play football at MSU (under the auspices of the Conference), to attend MSU as a student, and to comply with all applicable codes of conduct and obligations as both a football player and student at MSU.

125. That contract required that Defendants to fulfill their obligations to Plaintiff, and those obligations included:

a. To conduct their football program in a manner designed to protect and enhance the physical and educational well-being of its student-athletes, including Plaintiff and the other members of the Class; and

b. To furnish a safe environment for all of its football program's participants.

126. Plaintiff and the other members of the Class fulfilled their contractual obligations.

127. Defendants' contractual breaches caused Plaintiff and the other members of the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses.

128. As a result of its misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of all members of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT IV:**
**BREACH OF IMPLIED CONTRACT**
(*Individually and on Behalf of the Class as Against All Defendants*)

129. Plaintiff incorporates by reference all of the foregoing allegations.

130. As a football player at MSU, an institution governed by the NCAA, Plaintiff and the other members of the Class were required to, and did, enter into a contract with the NCAA as a prerequisite to sports participation. The contract required them to complete a form affirming that they had read the NCAA regulations and applicable NCAA Division Manual, which expressly encompassed the NCAA Constitution, the

NCAA Operating Bylaws, and the NCAA Administrative Bylaws, and further, that they agreed to abide by the NCAA Division Bylaws.

131. In exchange for Plaintiff's and the Class members' agreement, the NCAA promised to perform certain services and functions, including, inter alia:

a. Conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational welfare of student-athletes;

b. Requiring that each member institution protect the health of, and provide a safe environment for, each of its participating student-athletes; and

c. Requiring that each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience.

132. By signing and agreeing to abide by NCAA regulations, and thereafter participating in a NCAA-sanctioned sports program in accordance with such regulations, Plaintiff and the other members of the Class fulfilled their contractual obligations to the NCAA.

133. As described in the foregoing allegations, the NCAA breached the agreement by failing to ensure that its student-athletes were provided with a safe environment in which to participate in their NCAA sport activities. The NCAA further breached the contract by concealing and/or failing to properly educate and warn student-athletes about the symptoms and long-term risks associated with TBIs.

134. Plaintiff entered into a written agreement with NCAA in which he committed to play football at MSU (and, by extension, the Conference), to attend MSU

as a student, and to comply with all codes of conduct and obligations as both a football player and student at MSU.

135. That contract required that Defendants fulfill their obligations to Plaintiff, and those obligations included that:

a. To conduct their football programs in a manner designed to protect and enhance the physical and educational well-being of its student-athletes, including Plaintiff and the other members of the Class; and

b. To furnish a safe environment for student-athletes.

136. Plaintiff and the other members of the class fulfilled their obligations under the contract.

137. Defendants' contractual breaches caused Plaintiff and the other members of the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses.

138. As a result of its misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of all members of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT V:**
**BREACH OF EXPRESS CONTRACT**
(*Individually and on Behalf of the Class as Third-Party Beneficiaries as Against Defendant NCAA*)

139. Plaintiff incorporates by reference all of the foregoing allegations.

140. To the extent that no express or implied contract is found to exist between Plaintiff and Defendants, an express contract existed between Defendants. Under the

terms of that contract, Defendants agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

141. Under the terms of that contract, which, upon information and belief, are substantially similar to the terms set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, Defendants agreed to, among other things: (1) conduct intercollegiate athletic programs in a manner designed to protect and enhance the physical and educational well-being of student-athletes; and (2) protect the health of and provide a safe environment for each of its participating student-athletes.

142. Plaintiff and the other members of the Class are the intended third-party beneficiaries of the contract between Defendants. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA.

143. Defendants breached the contractual duties owed to Plaintiff and the other members of the Class under that contract by: (1) failing to implement or require guidelines and "return-to-play" criteria to minimize or prevent the risk of TBIs; and (2) failing to adequately inform and educate MSU football players regarding the symptoms and long-term dangers of TBIs.

144. As a direct result of Defendants' breach, Plaintiff and the other members of the Class suffered physical injury and damages in the form of past, ongoing, and future medical expenses, and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the other members of the Class will likely incur future damages caused by Defendants' conduct.

145. As a result of their misconduct, Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law. Plaintiff, individually and on behalf of the Class, seeks actual damages for NCAA's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable.

**COUNT VI:**
**UNJUST ENRICHMENT**
(*In the Alternative to Breach of Contract Counts*)
(*Individually and on Behalf of the Class as Against All Defendants*)

146. Plaintiff incorporates by reference all of the foregoing allegations.

147. Defendants receive significant revenues from the collegiate football played by student-athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

148. Defendants appreciate and have knowledge of such benefits.

149. Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they received at the expense of Plaintiff and the other members of the Class while refusing to pay for medical expenses incurred as a result of their unlawful actions or otherwise failing to prevent such injuries.

150. Plaintiff, individually and on behalf of the Class, seeks restitution and/or disgorgement of all monies Defendants have unjustly received as a result of their conduct alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Richard Walker, individually and on behalf of the Class, requests that the Court enter an Order providing for the following relief:

A. Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as Class Representative, and appoint his counsel as Class Counsel;

B. Declare that Defendants' actions, as set out above, constitute negligence, fraudulent concealment, breach of contract, and unjust enrichment;

C. Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendants' conduct, including without limitation damages for past, present, and future medical expenses, other out-of-pocket expenses, lost time and interest, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendants' misconduct;

D. Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

E. Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F. Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G. Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Date: September 30, 2016

Respectfully submitted,

**RICHARD WALKER**, individually and behalf of all others similarly situated.

s/Robert T. Dassow
ROBERT T. DASSOW, ESQUIRE (NO. 15145-64)
HOVDE DASSOW & DEETS
10201 N. ILLINOIS STREET, SUITE 500
INDIANAPOLIS, INDIANA 46290
PHONE: (317) 818-3100
FAX: (317) 818-3111
RDASSOW@HOVDELAW.COM

SOL H. WEISS, ESQUIRE (NO. 15925)
DAVID S. SENOFF, ESQUIRE (NO. 65278)
ONE LOGAN SQUARE
130 N. 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103
PHONE: (215) 790-4550
FAX: (215) 875-7733
SWEISS@ANAPOLWEISS.COM
DSENOFF@ANAPOLWEISS.COM

*ATTORNEYS FOR PLAINTIFF AND THE CLASS*